FILED
10/16/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 10, 2018 Session

## LEIGHANNE GORDON v. NOAH ADRIAN GORDON

**Appeal from the Chancery Court for Williamson County**
**No. 40683     Deanna B. Johnson, Chancellor**

_____

## No. M2017-01275-COA-R3-CV

_____

In this post-divorce action, a mother filed a petition to modify the parenting plan, seeking modification of the residential parenting schedule. The father filed a counter-petition requesting that he be designated the primary residential parent. At the conclusion of the father's direct examination, the mother moved for an involuntary dismissal of his counter-petition, arguing that he failed to prove a material change of circumstance that warranted a change in the primary residential parent. The trial court dismissed the father's counter-petition and modified the residential parenting schedule. Because the trial court did not allow the father to complete his proof before granting the motion for involuntary dismissal, we vacate the trial court's judgment in part, affirm in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated in Part, Affirmed in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Rebecca E. Byrd, Franklin, Tennessee, for the appellant, Noah Adrian Gordon.

Joanie L. Abernathy, Franklin, Tennessee, for the appellee, Leighanne Gordon.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Leighanne Gordon ("Mother") and Noah Adrian Gordon ("Father") are the parents of three children; only one child, Trey (born November 2007), remains a minor. The parties were divorced by order of the trial court on October 9, 2012. In the final decree, the trial court granted Mother a divorce on the ground of irreconcilable differences and

approved the parties' marital dissolution agreement ("MDA"), pursuant to which Mother was to receive "transitional alimony in the amount of $1,200.00 per month . . . for a period of six (6) years or until her death or Husband's death." The court then approved the parenting plan incorporated into the MDA, which designated Mother as the primary residential parent.

Under the parenting plan, Father had 110 days of parenting time with the children each year; the plan also included the parties' daughter, Savannah, who was a minor at the time of divorce. The parenting plan provided Father with parenting time as follows: (1) every Friday from 5:00 p.m. until Saturday at 10:00 a.m., (2) every other Saturday from 10:00 a.m. until Sunday at 6:30 p.m., (3) alternating New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day weekend, July 4th, Labor Day weekend, and Halloween, (4) every Father's Day weekend, (5) every Thanksgiving from Wednesday after school until Thursday at 2:00 p.m., (6) every winter vacation from December 25th from 1:00 p.m. until school resumes, (7) three hours on each child's birthday, and (8) two non-consecutive weeks during the summer. Father also had parenting time with Trey every Wednesday from 4:00 p.m. until Thursday at 8:00 a.m. (10:00 a.m. in the summer).[1] Finally, the parenting plan provided that the parties would equally divide the expenses for childcare, camps, and extracurricular activities.

Both Savannah and Trey have special needs. Savannah suffers from extreme obsessive compulsive disorder ("OCD") and anxiety. During early childhood, she was diagnosed with pediatric autoimmune neuropsychiatric disorders associated with streptococcus ("PANDAS") as the result of recurring strep infections. This disorder caused Savannah to have behavioral issues as a child. In recent years, Savannah has had significant problems with drugs and alcohol. She has entered drug and alcohol treatment at least three times and has been arrested for possession of drugs on at least two occasions.

The parties adopted Trey in 2007. Because Trey's biological mother abused drugs during her pregnancy, he was born addicted to drugs. He suffers from asthma, eczema, and chronic skin infections. He has been diagnosed with attention deficit hyperactivity disorder ("ADHD") and OCD. Although Trey has some weight problems, he stays active, especially by playing baseball.

For the first few years following the divorce, the parties enjoyed an amicable relationship. They communicated with each other frequently and made joint decisions regarding the children's medical care and extracurricular activities. The parties often attended Trey's baseball games together and, on Christmas morning, Father went to Mother's home and opened gifts with her and the children. Mother even gave Father a

---

[1] Father had parenting time with Savannah every Tuesday from 4:00 p.m. until Wednesday at 8:00 a.m. (10:00 a.m. in the summer).

key to her home so that he would have access to Trey's asthma medications in the event she was not home when Trey needed them during Father's parenting time.

The parties' relationship began to deteriorate around Halloween 2015. It was Father's year to exercise parenting time on that holiday, and he planned to take Trey trick-or-treating. Because Trey wanted to dress up as a baseball player, Mother packed his current baseball uniform and equipment. Shortly after dropping Trey off at Father's home, Mother received a text from Father informing her that Trey still wanted to be a baseball player for Halloween but wanted to wear a hat that went with one of his older uniforms. Mother retrieved the hat and returned to Father's home, hanging the hat on the mailbox. The hat was "filthy" because it had been in storage. After collecting the hat from the mailbox, Father washed it and Trey was able to wear it trick-or-treating that night. Although Father made no comment to Mother about the condition of the hat, Father's girlfriend, Angela, called Mother and berated her, using profane and vulgar language. When Mother confronted Father about Angela's behavior, he apologized and told Mother he would "take care of it."

Approximately two weeks later, the parties' relationship further deteriorated when Mother hosted a birthday party for Trey. She asked Father and Angela not to attend because she would feel uncomfortable after the conversation with Angela on Halloween; Father and Angela attended the party despite this request. When it was time to enter the private party room Mother had reserved, she asked one of her friends to inform Father and Angela that they were not allowed in the private party room and to request that they not cause a scene. Angela ignored this request and barged into the private party room where, in front of all the guests, she started "screaming and getting in [Mother's] face." Father stood in the doorway and observed Angela's behavior but said nothing. He and Angela finally left after Mother threatened to have them removed. During this party, Mother learned that Father and Angela had recently married. The children had no knowledge of Father's marriage prior to the party.

On December 9, 2015, Mother filed a petition to modify the residential parenting schedule, alleging that Father's marriage to Angela constituted a material change in circumstance. Specifically, she alleged that Angela's inappropriate behavior negatively affected the children. She further alleged that Father failed to pay his share of child care expenses and requested that the trial court hold Father in civil contempt and award her a judgment in the amount of $9,062.02.

Less than one month later, on January 7, 2016, Father filed a petition in the Juvenile Court for Williamson County alleging dependency and neglect against Mother. He based his petition primarily on accusations of child abuse reported to him by Savannah. The juvenile court dismissed the petition in an order entered on February 26, 2016, finding no probable cause that the children were dependent and neglected. Father then filed an appeal in the Circuit Court for Williamson County.

On May 19, 2016, Father filed an answer to Mother's petition as well as a counter-petition to modify the parenting plan, seeking to be named the primary residential parent because several material changes in circumstances had occurred. Specifically, he alleged that Mother (1) facilitated Savannah's drug and alcohol abuse problems by failing to provide adequate supervision or monitoring, (2) neglected to store medications and alcohol under lock and key, (3) failed to inform him of Savannah's problems, and (4) failed to follow the parenting plan regarding Savannah. The trial court consolidated Father's appeal of the juvenile court's decision with his counter-petition because both matters contained similar facts and allegations.

In October 2016, Mother married Patrick O'Hearn and moved from her home in Franklin to his home in Fairview. After learning of Mother's marriage, Father ceased paying alimony and filed a motion to terminate or suspend alimony payments, arguing there was a presumption that she no longer needed the transitional alimony because she had remarried and lived with her husband. Mother then filed a motion for civil contempt requesting that the court find Father in contempt for failure to pay alimony.

On March 8, 2017, Father filed an amended counter-petition alleging that Mother's marriage and relocation to Fairview constituted an additional material change in circumstance. He further alleged that child support should be modified because Savannah had turned eighteen in September 2016, had not graduated from high school, and lived with him rather than Mother. Prior to trial, Father also filed a witness list that provided the following witnesses might be called to testify: Mother, Father, David Lapell, Wil Nance, Tim Buppert, Steve Williams, Savannah, any witnesses of Mother, and "[a]ny necessary rebuttal witnesses."

The trial court heard the matter on April 3 and 4, 2017. After a brief opening statement by Father's attorney, Mother began presentation of her case-in-chief.[2] Mother testified first. She described Trey as "a sweet, kind boy" but stated that, in recent years, he had started acting out in school, citing behaviors such as fighting and being disrespectful. She attributed Trey's behavioral problems to mid-week visits with Father. Specifically, Mother testified that Trey needs structure and routine because he does not respond well to change. According to Mother, Trey misbehaved in school on Tuesdays because he did not want to go to Father's home on Wednesdays. She explained that Trey loves Father and enjoys spending time with him but prefers sleeping in his own bed. Mother stated that Trey also misbehaved in school on Thursdays after spending Wednesdays with Father. Trey often informed her that Father did not require him to go to bed early during the Wednesday visits because they would play games or go to the pool.

Mother testified that Father knew about Savannah's problems because they began before the divorce. Savannah struggled with extreme OCD and anxiety when she was a

---

[2] Mother's attorney declined to make an opening statement.

toddler. Due to Savannah's behavioral problems, Mother home-schooled her. Savannah started taking medications to address her various problems several years before the parties divorced. Mother stated that she always discussed Savannah's medications with Father because he took several of the same medications. In her early teens, Savannah decided she wanted to attend school with other children, and Mother allowed her to do so. Savannah experienced extreme difficulties, however, due to her anxiety. As a result, she turned to drugs for relief.[3]

In regard to Father's knowledge of Savannah's substance abuse issues, Mother testified that Savannah entered her first drug treatment program while the parties were still married, and they both took her to the treatment facility. Savannah entered drug treatment a second time after overdosing on Adderall. Mother stated that, although the parties were separated at that time, Father knew of the situation because Savannah called him when she could not reach Mother, and he took her to a walk-in clinic. After starting high school, Savannah became combative towards both parties, yelling at them and refusing to do her schoolwork. Mother testified that she and Father discussed how they should handle the situation, and they made the joint decision to enter Savannah into drug treatment a third time, where she stayed for four months. According to Mother, Father did not blame her for Savannah's substance abuse issues on any of these occasions.

Savannah completed her third drug treatment program in January 2016. Between January and June 2016, she only visited Father a few times. Mother testified that Savannah barely visited Father because she did not feel emotionally strong enough to spend time with him. Mother encouraged Savannah to visit Father but honored her wishes and did not require her to spend time with him.

Pursuant to the parenting plan, Savannah and Trey were supposed to spend July 4, 2016 with Father. He planned to take them to Illinois to spend time with his family. Mother testified that Savannah did not want to go with Father. Because Mother would be out of town, Savannah asked Mother if she could stay with Jacqueline, the parties' oldest daughter. Mother agreed despite knowing that Jacqueline had allowed Savannah to smoke marijuana in the past. Mother stated that she instructed Savannah to discuss it with Father. According to Mother, she contacted Father before she left town to ensure that he knew where Savannah would be staying.

Mother takes heart, stomach, and allergy medications. For more than ten years, she has taken 0.5 milligrams of Xanax "at night as needed." Mother testified that, when the children are in her home, she keeps her drugs and alcohol locked in a closet. She further testified that she is the only one who has a key to the closet. According to Mother, she never noticed any of her medications missing. She stated that, to her

---

[3] Savannah turned eighteen while the current action was pending and is not a subject of this appeal.

knowledge, Savannah had not stolen any of her medications. Mother later contradicted this testimony, however, by admitting that "one time [Savannah] was caught with half of a Hydrocodone . . . that she got from [Mother's] stuff."

Mother also testified regarding concerns she had about Angela. In addition to the incidents that occurred at Halloween and Trey's birthday party, Mother stated that Angela began harassing her after marrying Father. For instance, Mother would see Angela parked in her driveway staring at her house. Angela once called the police and reported that Mother was driving under the influence. Mother testified that she had not had any alcohol when Angela made that call. On another occasion, Mother called the police about Angela while out with friends because Angela was following them. She stated that, on one occasion, Trey returned from a visit with Father and informed her that he had slept in a bed with Angela while Father was not home.

Additionally, Mother expressed concern about Angela's inside dog being around Trey because he is severely allergic to dogs. She testified that Father was aware of this fact prior to marrying Angela because he was present when the allergy test was performed and when the doctor specified that Trey should have limited exposure to dogs. After learning that Angela kept a dog inside at Father's home, Mother discussed her concerns with Father and shared a letter with him she had received from Trey's allergy doctor explaining that continued exposure to dogs could impair Trey's ability to breathe.[4] Mother testified that the dog remained inside Father's home, sleeping on the beds, climbing on the furniture, and jumping into bed with Trey.

Finally, Mother testified regarding alimony payments Father failed to pay. Father knew she remarried in October 2016 and moved to Fairview to live with her husband because he had dropped Trey off at her new residence. Moreover, he asked her if Trey would be transferring schools. Although Father knew of her marriage, Mother testified that he still paid her alimony in November 2016. He ceased making alimony payments, however, in December 2016—around the time she filed her petition to modify. Mother agreed that alimony should terminate as of April 2017 but stated that she was still entitled to payments for December 2016 through March 2017 because she continued to have the same monthly expenses for her mortgage, homeowner insurance, and utilities until her house sold in March 2017.

Mother's husband, Patrick O'Hearn, testified next for Mother. He corroborated Mother's testimony that Trey is allergic to dogs. He stated that he has two dogs. Although the dogs have never lived inside his home, they occasionally come inside for a few hours when there are severe thunderstorms. He also corroborated Mother's testimony that she kept alcohol locked in a closet. He slightly contradicted her testimony

---

[4] Although Mother did not attempt to introduce the letter at trial, the record shows that she attached a copy of the letter to her petition to modify.

regarding her medications, however, testifying that she did not keep them in a locked closet. Instead, she kept them in an unlocked, "high kitchen cabinet" where she also kept Trey's medications.

Jacqueline Gordon also testified on behalf of Mother. She is Mother's biological daughter from a previous relationship, and Father adopted her after marrying Mother. She testified that, although Savannah never mentioned taking any of Mother's alcohol or prescriptions, she did admit to Jacqueline that she "got alcohol from [Father's] home." Jacqueline admitted that, while Savannah was in her care in 2012, she allowed Savannah to smoke marijuana; however, she explained that she did not provide Savannah with the marijuana or smoke it with her. After Savannah completed the first drug treatment program in 2014, Mother asked Jacqueline to supervise Savannah while Mother was at work.

In regard to where Savannah was to spend July 4, 2016, Jacqueline testified that she agreed to allow Savannah to stay with her after learning that Mother was going out of town and that Savannah did not want to go with Father and Trey to Illinois. She stated that, at first, everyone seemed to agree to that plan, but it then "turned into a big ordeal." According to Jacqueline, she informed Father that Savannah was safe and would be with Jacqueline the whole time. Father then claimed, however, that he had no knowledge of Savannah's whereabouts. Savannah was on probation during this time period, and Father went to the juvenile authorities when he could not locate her. Jacqueline stated that Savannah was "really upset" that Father went to the juvenile authorities. A few days later, Savannah began using drugs again.

Finally, the trial court heard testimony from Father. He expressed concern that Mother does not provide adequate supervision because he noticed that Trey began experiencing issues with hygiene and weight gain. Specifically, Trey must be diligent with his personal hygiene to prevent the development of rashes. Father believes that Trey is capable of maintaining his hygiene himself but that he requires some supervision to ensure that he is thorough. Father testified that Mother is not providing the necessary supervision because, on several occasions, Trey has come to Father's home with significant rashes.

In regard to his concerns about Trey's weight, Father testified that Trey "is on the heavy side." During the years between the parties' divorce and the trial of this case, Trey gained some weight that Father attributes to Trey's consumption of too many calories. Specifically, he testified that Mother allows Trey to overeat when he is in her care. Father introduced into evidence photographs he took of lunches that Mother prepared for Trey. One photograph showed that Mother packed Trey four pieces of pizza, a Go-Gurt, a brownie, chips, and some fruit juice. The other picture showed a lunch that included three pieces of pizza, a Go-Gurt, and a bag of pretzels.

Father testified that he was also concerned about Trey's access to alcohol and prescription medications in Mother's home. In October 2015, Father used the emergency key to Mother's home to retrieve certain items he needed during his parenting time with Trey. He discovered that Mother had placed several bottles of alcohol and prescription drugs in an unlocked closet where the children's games and coloring books were once kept. In Mother's refrigerator, he found three bottles of wine and one bottle of vodka. Moreover, he found at least nine empty wine and vodka bottles. Savannah was in a drug treatment program at that time. Father stated that, because he was worried about the environment Savannah would be returning to, he took pictures of the alcohol and prescription drugs he found in Mother's home and sent them to Savannah's therapists.

When Savannah was released from treatment in 2016, Father removed all alcohol from his home and instituted new house rules, stressing that there would be no drugs or alcohol allowed in his home. Thereafter, Savannah stopped visiting with Father and Mother failed to enforce the parenting time provided to Father in the parenting plan. He testified that he had to file a motion to compel in order to exercise his parenting time. At the time of trial, Savannah resided with Father and was doing well.

For July 4, 2016, Father planned to take the children to Illinois to visit with his family. When the time came to leave for Illinois, he could not locate Savannah. Father testified that he contacted Mother about Savannah's whereabouts but Mother did not answer. At the time, Savannah was on probation, and one of the conditions of her probation was that she obey her parents. Father stated that, after two days of not being able to locate Savannah, he sent her a text informing her that she was not allowed to stay on her own. Furthermore, he informed her that, if she would not answer her phone or come on the trip, he would have no choice but to contact her probation officer and have the authorities locate her. Father then received a message from Jacqueline stating that Savannah was staying with her.

In regard to Angela, Father agreed that she should not have communicated with Mother about Trey's Halloween costume, especially in the manner in which she communicated. He testified that he attempted to rectify the mistake by speaking to Angela about her communications with Mother. After acknowledging that Trey has allergies, Father admitted that Angela did have a dog that stayed inside his home while Trey was there. He explained that he did not want to take the dog away because Trey loves the dog. Father keeps the home clean, regularly bathes the dog, keeps the dog off the bedding, and forces Trey to wash his hands after petting the dog. Moreover, he stated that Trey's allergies are well-controlled by his medications.

Father and Angela have lived separately since August 2016. At the time of trial, he lived in a house in Bellevue that was a twenty-six-minute drive from Mother's residence in Fairview and a twenty-five-minute drive from Mother's former residence in Franklin. Although Trey would finish the school year in Franklin, he would need to

enroll in a different school the following year due to Mother's move to Fairview. Father testified that, because he still owned property in Franklin, Trey would not need to change schools if Father was the primary residential parent.

Finally, Father testified about his ability to pay alimony to Mother. He is a self-employed writer and producer who primarily works with Average Joe's Entertainment. In the four years prior to trial, his adjusted gross income was as follows: $47,619 in 2013; $62,448 in 2014; $45,797 in 2015; and $79,625 in 2016. Father testified that he had never missed a child support or alimony payment prior to 2016. He admitted that he ceased paying alimony to Mother in December 2016 but explained that he stopped paying for two reasons. First, to make those payments, he was unable to set aside the $900 per month necessary to pay his self-employment taxes. As a result, he owed the Internal Revenue Service $63,000 in back taxes. Continuing to pay alimony would cause him to go even further into debt. Second, he stated it was his "understanding from counsel that alimony ends upon remarriage."

After Father's attorney completed her direct examination of Father, Mother's attorney made an oral motion to involuntarily dismiss Father's counter-petition to modify the parenting plan on the ground that he failed to prove a material change in circumstance. The court granted the motion and allowed counsel for Mother to cross-examine Father regarding Mother's petition to modify the parenting plan.

During cross-examination, Father acknowledged that the final divorce decree ordered the parties to equally divide expenses for childcare, camps, and extracurricular activities, but he believed that he did not owe Mother any money that she paid towards childcare. He explained that, at the time of divorce, he agreed to deviate upwards from the child support guidelines in the amount of $497 per month for "the needs of the family, equity of the parties and best interest of the minor children." According to Father, the extra money he agreed to pay was to be spent on childcare costs.

The trial court entered a memorandum and order on May 25, 2017, finding two material changes in circumstances had occurred: (1) Trey's behavior problems at school before and after weekday visits with Father, and (2) Father's "bad decisions over the last couple of years." The court then found that it was in the best interest of the child to modify the residential parenting schedule and adopted the parenting plan proposed by Mother. The new parenting plan still provides Father with 110 days of parenting time per year. Under the new plan, however, Father no longer has weekday visitation. Instead, the majority of his visitation occurs every other "Friday after school or 3:00 p.m. to Monday morning to school." Finally, the court ordered Father to pay Mother $4,800 in unpaid alimony,[5] $5,029.50 for childcare expenses, and $49,157 in attorney fees. Thereafter, Father timely appealed.

_____

[5] At the end of trial, Mother requested that Father not be held in contempt for failing to pay alimony as

On appeal, Father raises the following issues: (1) Whether the trial court erred in dismissing his counter-petition, (2) whether the trial court erred in modifying the residential parenting schedule, (3) whether the trial court erred in adopting Mother's proposed child support worksheet, (4) whether the trial court erred in awarding Mother a judgment for unpaid alimony, (5) whether the trial court erred in awarding Mother a judgment for past unpaid childcare expenses, and (6) whether the trial court erred in awarding Mother her attorney fees.

STANDARD OF REVIEW

Our review is de novo upon the record, accompanied by a presumption of correctness of the trial court's findings of fact, unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review a trial court's conclusions of law de novo, according them no presumption of correctness. *Armbrister*, 414 S.W.3d at 692; *Rigsby v. Edmonds*, 395 S.W.3d 728, 734 (Tenn. Ct. App. 2012). A trial court's determinations of whether a material change in circumstance has occurred and where the best interests of the children lie are factual issues. *Armbrister*, 414 S.W.3d at 692; *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Appellate courts must, therefore, presume a trial court's factual findings on these matters are correct and not overturn them unless the evidence preponderates to the contrary. *Armbrister*, 414 S.W.3d at 693.

As our Supreme Court has explained:

Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007).

*Id*. Trial courts have broad discretion to work out the details of parenting plans. *Id*. A trial court abuses its discretion when it "'appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.'" *Id*. (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)).

---

she had requested in her petition. Instead, she asked the court to award her a judgment for the missed alimony payments.

ANALYSIS

A. Involuntary Dismissal of Father's Counter-Petition

Father argues that the trial court erred when it dismissed his counter-petition to modify the parenting plan before he completed his proof. A thorough examination of the record shows that Father had not closed his proof when the trial court granted Mother's motion for an involuntary dismissal. Prior to closing arguments, counsel for Father asked the trial court to reconsider its decision to dismiss Father's counter-petition because Father had not closed his proof.[6] In its final order, the trial court agreed to reconsider the dismissal but did not allow Father to continue his proof. Instead, the trial court merely reexamined the proof Father presented at trial and concluded that he had failed to prove a material change in circumstance had occurred.

Tennessee Rule of Civil Procedure 41.02(2) governs involuntary dismissals in bench trials and provides as follows:

> After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiffs evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court grants the motion for involuntary dismissal, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.

We have previously held that "Rule 41.02(2) clearly contemplates that the proper time to lodge a motion for involuntary dismissal is after plaintiff 'completed the presentation of plaintiff's evidence.'" *Parsons v. Parsons*, No. W2016-01238-COA-R3-CV, 2017 WL 1192111, at *5 (Tenn. Ct. App. Mar. 30, 2017) (quoting TENN. R. CIV. P. 41.02(2)). Moreover, the Tennessee Supreme Court has declared that Rule 41.02(2) "contemplates that the plaintiff's evidence shall be heard and evaluated by the court prior to an involuntary dismissal order at trial." *Harris v. Baptist Mem'l Hosp.*, 574 S.W.2d 730, 732 (Tenn. 1978). As a result, we have repeatedly held that, when a trial court dismisses a case pursuant to Rule 41.02(2) before a plaintiff has closed his or her proof, it

---

[6] Although Father's attorney did not specify which additional witnesses would be called, the witness list Father filed with the court prior to trial provided that he might call the following witnesses to testify: David Lapell, Wil Nance, Tim Buppert, Steve Williams, Savannah, any witnesses of Mother, and "[a]ny necessary rebuttal witnesses."

constitutes reversible error. In *Ruff v. Raleigh Assembly of God Church, Inc.*, No. 02A01-9410-CV-00226, 1996 WL 9730, at *1 (Tenn. Ct. App. Jan. 9, 1996), the plaintiff filed a complaint against a church for "assault, battery, false imprisonment and intentional infliction of emotional distress." After the plaintiff had presented testimony from eight witnesses in addition to his own testimony, but before he had closed his proof, the trial court sua sponte ordered an involuntary dismissal of the plaintiff's suit. *Id.* at *2.[7] We held that the trial court erred in ordering the involuntary dismissal prior to the close of the plaintiff's proof and remanded to allow the plaintiff to complete his proof. *Id.* at *4.

In *In re G.T.B.*, No. M2008-00731-COA-R3-PT, 2008 WL 4998399, at *2 (Tenn. Ct. App. Nov. 24, 2008), the mother's attorney moved for an involuntary dismissal of the Department of Children's Services's ("DCS") case after DCS had called just two of its witnesses.[8] The trial court granted the motion despite the fact that DCS had not closed its proof, finding that "the remaining witnesses disclosed by DCS do not have the ability to change the clear and convincing burden of proof which indicates that DCS failed to remain objective in an effort to provide reasonable efforts." *In re G.T.B.*, 2008 WL 4998399, at *2. On appeal, we concluded that the trial court erred in dismissing DCS's case prior to the completion of its proof because, "once a case has proceeded to trial, the trial court should allow [the plaintiff] to present all of its proof, subject to the rules of evidence, before deciding whether the case should be dismissed, either *sua sponte* or upon the defendant's motion." *Id.* at *4.

Similarly, in *Parsons v. Parsons*, 2017 WL 1192111, at *2, the husband's attorney moved for an involuntary dismissal after the wife's attorney completed direct examination of the wife. Although the wife had not yet closed her proof, the trial court granted the motion to dismiss. *Parsons*, 2017 WL 1192111, at *2. This court concluded that, in light of *Ruff* and *G.T.B.*, the trial court erred in dismissing the case before the wife completed her proof, and we remanded for further proceedings. *Id.* at *6.

*Ruff*, *G.T.B.*, and *Parsons* clearly indicate that Rule 41.02(2) does not empower a trial court to order an involuntary dismissal before the plaintiff closes his or her proof. We, therefore, conclude that the trial court erred in dismissing Father's counter-petition

---

[7] Rule 41.02(2) does not expressly authorize a trial court to sua sponte order an involuntary dismissal. The Tennessee Supreme Court, however, concluded that a trial court may order a dismissal pursuant to Rule 41.02(2) "under certain circumstances and upon adequate grounds." *Harris*, 574 S.W.2d at 731. To ensure that a party is not denied the right to a hearing, "this power must be exercised most sparingly and with great care . . . ." *Id.*

[8] Although counsel for the mother requested a directed verdict, we construed the motion as a motion for an involuntary dismissal. *In re G.T.B.*, 2008 WL 4998399, at *2-4. Motions for directed verdicts are inappropriate in bench trials. *Parsons*, 2017 WL 1192111, at *5; *see also* TENN. R. CIV. P. 41.02(2) (stating that a defendant may move for an involuntary dismissal at the close of plaintiff's proof "in an action tried by the court *without a jury*") (emphasis added).

- 12 -

to modify the parenting plan before he closed his proof.  Based on this conclusion, we vacate the trial court's order in all respects except for the following awards that will be discussed below:  (1) unpaid alimony and (2) past childcare expenses.  Accordingly, Father's issues, other than those regarding unpaid alimony and past childcare expenses, are pretermitted.

## B.  Unpaid Alimony

Father next argues that the trial court erred in awarding Mother $4,800 in unpaid alimony for December 2016 through March 2017.  Specifically, he asserts that the trial court should have concluded that alimony payments terminated when Mother began living with Mr. O'Hearn[9] because a rebuttable presumption arose that she no longer needed to receive alimony and her evidence failed to rebut that presumption.

Pursuant to Tenn. Code Ann. § 36-5-121(g)(2)(C), transitional alimony awards are nonmodifiable unless (1) the parties agree otherwise, and the agreement is incorporated into the trial court's order, (2) the court provides otherwise in its order granting the award, or (3) the alimony recipient cohabitates with a third person.  If a transitional alimony recipient begins living with a third person, a rebuttable presumption arises that:

> (i) The third person is contributing to the support of the alimony recipient and the alimony recipient does not need the amount of support previously awarded, and the court should suspend all or part of the alimony obligation of the former spouse; or

> (ii) The third person is receiving support from the alimony recipient and the alimony recipient does not need the amount of alimony previously awarded and the court should suspend all or part of the alimony obligation of the former spouse.

Tenn. Code Ann. § 36-5-121(g)(2)(C).  "'Once the presumption arises, the alimony recipient bears the burden of demonstrating a need for the previously awarded alimony, notwithstanding the cohabitation.'"  *Hickman v. Hickman*, No. E2013-00940-COA-R3-CV, 2014 WL 786506, at *7 (Tenn. Ct. App. Feb. 26, 2014) (quoting *Gentry v. Gentry*, No. M2007-00876-COA-R3-CV, 2008 WL 275881, at *4 (Tenn. Ct. App. Jan. 31, 2008)).  Tennessee courts have concluded that an alimony recipient rebuts the presumption if he or she "demonstrate[s] continuing need, despite living with a third person and either receiving support from, or providing support to, the third person."  *Id.*  Trial courts are accorded wide discretion in making determinations that pertain to

---

[9] The parties dispute when Mother began living with Mr. O'Hearn.  At trial, Mother testified that she married Mr. O'Hearn in October 2016 and began living with him "right around that time."  According to Father, Trey informed him that Mother began living with Mr. O'Hearn in August 2016.

modification of spousal support. *Harris v. Harris*, No. M2008-00601-COA-R3-CV, 2009 WL 416007, at *3 (Tenn. Ct. App. Feb. 18, 2009). Accordingly, we will not second-guess the trial court's determination absent an abuse of discretion. *Hickman*, 2014 WL 786506, at *4 (citing *Gonsewski*, 350 S.W.3d at 105).

At trial, Mother testified that she began living with Mr. O'Hearn around October 2016, and that she had not received any alimony from Father since November 2016. She agreed that alimony should terminate effective April 2017 because she no longer needed it. She stated she still needed the alimony from December 2016 through March 2017, however. During that four-month time period, she lived with Mr. O'Hearn, but her expenses were the same as prior to living with him because she still owned her house in Franklin. Consequently, Mother needed the $1,200 per month in alimony during that four-month period to pay the monthly mortgage of $1,300, plus the utilities and homeowner insurance until her house sold in March 2017. We conclude that, with this testimony, Mother rebutted the presumption.

Additionally, we note that an examination of the parties' MDA reveals that the parties made no provision for the transitional alimony to automatically terminate upon Mother's remarriage. The trial court, therefore, was under no obligation to retroactively modify the alimony award to the date of Mother's remarriage. *See Harris*, 2009 WL 416007, at *4. Under the circumstances of this case, we conclude that the trial court did not abuse its discretion in finding that Father owed Mother $4,800 in unpaid alimony for the time period December 2016 through March 2017.

### C. Past Children's Expenses

#### 1. Upward Deviation

Father argues that the trial court erred in awarding Mother $5,029.50 in past childcare expenses. The parenting plan provides that "Mother and Father will divide the costs of childcare, camps and extracurricular expenses equally." Pursuant to this provision, Mother requested that Father reimburse her for his share of childcare expenses for Trey. At trial, she introduced into evidence a statement from the Goddard School showing that she paid $10,059 in childcare expenses from October 2012 through December 2013. Father asserts that he should not have to reimburse Mother because his monthly child support payment included an upward deviation in the amount of $497 to cover childcare expenses. We respectfully disagree.

Under Tennessee law, parents must "support their minor children in a manner commensurate with their own means and station in life." *Richardson v. Spanos*, 189 S.W.3d 720, 724 (Tenn. Ct. App. 2005). The child support guidelines govern the process and criteria for determining the amount of a parent's child support obligation. Tenn. Code Ann. § 36-5-101(e); *see also Atkins v. Motycka*, No. M2007-02260-COA-R3-CV,

- 14 -

2008 WL 4831314, at *6 (Tenn. Ct. App. Nov. 6, 2008). "[T]he amount of support derived from a proper application of the formula in the Child Support Guidelines becomes the presumptive amount of child support owed." *Richardson*, 189 S.W.3d at 725. This presumptive amount is rebuttable, however, and trial courts may, in their discretion, deviate from the amount of support required by the child support guidelines. *Atkins*, 2008 WL 4831314, at *6. If a trial court elects to deviate from the child support guidelines, the court must "specifically state in written findings why the application of the Child Support Guidelines would be unjust or inappropriate." *Id.* (citing Tenn. Code Ann. § 36-5-101(e)(1)(A) and TENN. COMP. R. & REGS. 1240-2-4-.07(1)(b)). We review a trial court's decision regarding deviations from the child support guidelines pursuant to the abuse of discretion standard of review. *Id.*

In the present case, Father's presumptive child support obligation was $778. Father agreed to an upward deviation in the amount of $497, increasing his monthly child support obligation to $1,275. The agreed parenting plan approved by the trial court provides the following reasons for the deviation: "Father is in agreement to deviate upwards to $1,275.00 based on *the needs of the family, equity of the parties and best interest of the minor children.*" (Emphasis added). Nowhere in the record is it specifically stated that the upward deviation was to cover childcare expenses. Moreover, because the parenting plan ordered the parties to divide childcare expenses equally, Father was specifically obligated to pay one-half of the childcare expenses. As a result, these expenses may not be considered as the basis for an upward deviation. *See Atkins*, 2008 WL 4831314, at *7 (holding that an upward deviation based on camp fees was improper because the parenting plan required the father to pay one-half of the camp fees). Father's argument is without merit.

We note that the reasons provided to support the upward deviation appear too general to satisfy the specificity required for justifying a deviation; however, neither party challenges the validity of the deviation on appeal. On remand, if the trial court includes the upward deviation when setting the child support obligation, it should state its justification with more specificity.

2. Offset of Expenses

Father argues in the alternative that his share of the past childcare expenses should be offset by expenses he paid but for which he did not seek reimbursement prior to trial, which include expenses for Trey's iPad and Savannah's therapy and cellular phone. We respectfully disagree. The parenting plan contains no provision allowing the parties to offset their share of childcare expenses by paying other expenses. Instead, it merely provides that the parties are to divide childcare expenses equally. Moreover, in his appellate brief, Father cites to no authority supporting his argument that he is entitled to a set-off because he paid these additional expenses, and we are aware of no such authority. Although voluntarily paying these extra expenses for Trey and Savannah may constitute

- 15 -

good parenting, being a good parent does not entitle Father to set-off. A party does not receive a gold star for doing something he or she should do. Father's argument is without merit.

In light of the foregoing, we conclude that the trial court did not err in awarding Mother a judgment for past childcare expenses.

### D. Attorney Fees

Mother requests that she be awarded her attorney fees on appeal. Litigants are generally required to pay their own attorney fees unless a statute or contract provision provides otherwise. *John Kohl & Co., P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998). Tennessee Code Annotated section 36-5-103(c) often provides a basis for an award of attorney fees at trial and on appeal. Pursuant to section 36-5-103(c), reasonable attorney fees may be recovered by prevailing parties in "proceeding[s] to enforce, alter, change, or modify any decree of alimony . . . , or in any suit or action concerning the adjudication of the custody or change of custody of any children." A decision to award attorney fees on appeal, however, is within the discretion of the appellate court. *Paschedag v. Pachedag*, No. M2016-00864-COA-R3-CV, 2017 WL 2365014, at *5 (Tenn. Ct. App. May 31, 2017). Mother has prevailed on some issues but so has Father. As such, we exercise our discretion to deny Mother's request for attorney fees incurred on appeal.

CONCLUSION

For the foregoing reasons, we vacate the trial court's order dismissing Father's counter-petition, modifying the permanent parenting plan, and awarding Mother her attorney fees is vacated. We affirm the trial court's order that Father pay Mother $4,800 in unpaid alimony and $5,029.50 for past childcare expenses, and remand for further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are assessed equally against the appellant, Noah Adrian Gordon, and the appellee, Leighanne Gordon, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE